**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CITGO PETROLEUM CORPORATION<br>and PDV MIDWEST REFINING, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 10 C 4743 |
| v. | ) | |
| | ) | Hon. Rebecca R. Pallmeyer |
| INTEGRYS ENERGY SERVICES, INC. , | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In 2008, Plaintiffs PDV Midwest Refining, LLC ("PDVMR") and CITGO Petroleum Corporation ("CITGO," and collectively with PDVMR, "Plaintiffs") entered into an agreement with Defendant Integrys Energy Services, Inc. ("Integrys" or "Defendant"), in which Integrys agreed to provide electricity to Plaintiffs' petroleum refinery in Lemont, Illinois.[1]  The following year, as the parties approached the end of the initial twelve-month contract period, a dispute arose over whether Plaintiffs would be obliged to reimburse Defendant for certain charges instituted by the state legislature should Plaintiffs exercise their option to renew for a second year.  As a result, Defendant sent Plaintiffs notice of its decision to terminate the contract at the end of the initial term.

In this lawsuit, brought under the court's diversity jurisdiction, Plaintiffs claim that Integrys's termination notice breached the contract, in violation of Plaintiffs' right to renew the contract for another twelve-month period.  Defendant claims that it properly exercised its unilateral right to terminate the contract.  In the alternative, Defendant also raises several affirmative defenses, including anticipatory repudiation and unclean hands, stemming from Plaintiffs' alleged refusal to pay the new charges.

---

[1]     The documents that comprise the contract refer to PDVMR as the party to the contract and CITGO as the guarantor.  For purposes of this Memorandum Opinion and Order, the court refers to the rights and obligations under the contract as those of Plaintiffs collectively.

The parties have filed cross-motions for summary judgment. For the reasons below, the motions are granted in part and denied in part.

## BACKGROUND

### I.     The Parties

Plaintiff PDVMR is a Delaware limited liability company composed of one member: VPHI Midwest, Inc., a Delaware corporation with its principal place of business in Houston, Texas. (Pls.' 56.1 ¶ 1.) PDVMR is a wholly owned subsidiary of Plaintiff CITGO, a Delaware corporation with its principal place of business in Houston, Texas. (*Id.* ¶ 2.) Defendant Integrys, a retail supplier of electric power, is a Wisconsin corporation with its principal place of business in De Pere, Wisconsin. (*Id.* ¶ 3.) This court has diversity jurisdiction over the contract dispute between these parties, in which more than $75,000 is a stake, and the parties agree that venue is proper because Plaintiffs' refinery, which Defendant contracted to furnish with electric power, is located in this district. (*Id.* ¶ 5.)

### II.     The Contract

The lawsuit has its origins in the "Power Sale Agreement" and "Confirmation" executed by PDVMR on August 20, 2008 and by Integrys on September 9, 2008. (Power Sale Agreement, Ex. 1 to Am. Compl.; Confirmation, Ex. 2 to Am. Compl.) On August 21, 2008, Plaintiff CITGO executed a Guaranty of PDVMR's obligations (collectively, with the Power Sale Agreement and the Confirmation, the "contract"). (Guaranty, Ex. 3 to Am. Compl.) Under the terms reflected in those documents, Integrys agreed to provide electric power to a refinery owned by PDVMR and operated by CITGO in Lemont, Illinois. It is undisputed that for several weeks before executing the contract, the parties engaged in negotiations and, with the assistance of their attorneys, exchanged multiple drafts. Integrys prepared a draft Confirmation and Supplemental Confirmation on July 23, 2008. (Def.'s 56.1 ¶ 10.) Plaintiffs contend the negotiations began two months earlier, in May 2008, when Integrys responded to CITGO's request for proposal ("RFP") for the supply of electricity to the

Lemont Refinery. (Pls.' 56.1 Resp. ¶ 10; Pls.' 56.1 ¶¶ 6-8.) In addition to the relevant provisions discussed below, the contract included an integration clause. (Def.'s 56.1 ¶ 23.)

### A.    Renewal Provision

This case hinges, in part, on the meaning of the contract renewal provision in the Confirmation. The Confirmation defines a one-year "initial Delivery Period," from September 2008 through the latest meter read date in September 2009. (Pls.' 56.1 ¶ 18.) Thereafter, Integrys would continue to provide electricity on the same terms, unless one of certain events occurred. Specifically, the Confirmation contains a section entitled "Renewal" (the "Renewal provision"), which provided:

> After the initial Delivery Period, service shall continue on a billing cycle-to-billing cycle basis at the same terms and conditions unless (i) terminated by either Party giving 30 days written notice prior to the end of the initial Delivery Period noted above, or (ii) PDVMR exercises it's [sic] option to renew the contract for a second year, pursuant to the Special Conditions below, as evidenced by a fully executed Confirmation for the second year.. Subject to PDVMR renewing for a second year, after the second year, service shall continue on a billing cycle-to-billing cycle basis at the same terms and conditions unless terminated by either Party giving 30 days written notice.

(Confirmation at 3 (extra punctuation in original).) Critical to this dispute, the contract does not explicitly provide for which of the two alternatives has priority should Integrys wish to terminate the contract at the end of the initial Delivery Period, but PDVMR wish to exercise its option to renew the contract for a second year.

Under the "Special Conditions" referenced in the Renewal provision, the Confirmation provides that "PDVMR shall have the right to renew the Confirmation for an additional twelve (12) month Delivery Period," subject to rate adjustments should certain components of the ancillary rate deviate more than 10% from the previous year. (Confirmation at 4.)[2] The Special Conditions also

---

[2]    The Confirmation provided that the Ancillary Rate consisted of the following components: the Ancillary Charge, the Day Ahead Operating Reserve Charge, the Auction Reserve Rights Credit, and the Transmission Loss Credit. (Confirmation at 3.) The Special Conditions
(continued...)

set a timetable for renewal: Integrys was required to notify PDVMR of any change in the rates by June 15, 2009; PDVMR then had until July 30 to decide whether to exercise its option to renew. (*Id.*)[3] Should PDVMR choose to renew for another year, the contract provides, "the Confirmation will renew with the same terms and conditions as the initial Delivery Period," subject to any of the specified rate adjustments. (*Id.* at 5.)

Defendant notes that subsection (i) of the Renewal provision, which allows for unilateral termination of the contract past the initial Delivery Period by either party, remained unchanged throughout the negotiations process, and was a standard term in Integrys's customer contracts. (Def.'s 56.1 ¶¶ 18-19.) With respect to subsection (ii), Defendant argues that despite the language in the Confirmation identifying the "option" or "right to renew" as PDVMR's, the renewal right was not unilateral. Defendant maintains that the contract provided merely for an option to renew provided that both parties agreed. In support, Defendant emphasizes the unilateral termination provision of subsection (i) and the language in subsection (ii) requiring that PDVMR's election to renew be "evidenced by a fully executed Confirmation for the second year."

The termination provision may have been a standard feature of Integrys agreements, but it appears that the renewal clause was not. The option to renew in subsection (ii) had its origins in negotiations over a pricing error in Integrys's response to CITGO's RFP. (Pls.' 56.1 ¶¶ 10-11.)

---

[2](...continued)
allowed for adjustment of the Operating Reserve Charge and the Transmission Loss Credit based on changes in the value of those rates as published by PJM Interconnection, LLC. (*Id.* at 4.) PJM is, according to its website, a "regional transmission organization (RTO) that coordinates the movement of wholesale electricity in all or parts of 13 states and the District of Columbia." PJM, *About PJM*, http://www.pjm.com/about-pjm.aspx (last visited May 31, 2012). Should the published rates during the initial Delivery Period vary more than 10% from those published in 2007, the Special Conditions applied an algorithm to increase (in the case of Operating Reserves), or to increase or decrease (in the case of the Transmission Loss Credit), the rates that would apply to the second year. (*Id.* at 4-5.)

[3]     By comparison, the earliest date by which either parties' 30-day notice to terminate could have been due was early August.

When Integrys realized that the price quoted in its initial response was lower than it intended, it offered CITGO two options: (1) the lower price ($1.135 per megawatt hour) for a one-year term, or (2) a higher price ($1.355 per megawatt hour) for a one-year term with an option to renew. (*Id.*; Def.'s 56.1 Resp. ¶ 11.) Integrys's representatives referred to the second option as an attempt to "share half the pain" with Plaintiffs by raising the rate initially offered in Integrys's response to the RFP, but giving Plaintiffs the option to renew those still-favorable terms for a second year. (Fahey Dep., Ex. I to Pls.' 56.1, at 214-217; E-mail Message from Fahey to Fillar of 7/16/2008, Ex. J to Pls.' 56.1; E-mail Messages between Fahey and Zimonick of 7/11/2008, Ex. K to Pls.' 56.1.) The court infers from the terms of the Confirmation that the parties settled on the second option.

According to Plaintiffs, the contract language established their unilateral right to renew. They point, in addition, to circumstances surrounding the contract's negotiation. First, Plaintiffs note that CITGO's RFP requested bids for a "12-month contract with CITGO's option to extend for an additional 12-month period at same terms and conditions under initial 12-month contract." (Pls.' 56.1 ¶ 7.) Plaintiffs also point to Integrys documents and Integrys employees' internal and external communications, both before and after execution of the contract, which do appear to recognize the option to renew as Plaintiffs' to exercise. In particular, communications from James Fahey, one of Integrys employees principally responsible for negotiations with Plaintiffs, made repeated reference

to the renewal option as a right Plaintiffs enjoyed under the contract's terms.  (Pls.' 56.1 ¶¶ 14-16.)[4]

### B.    "Pass Through" Provision

Another contract provision relevant to this dispute is what the parties refer to as the "Pass

Through" provision.  The Power Sale Agreement addressed changes in tariffs or law that affect

Integrys's cost of providing the electricity and shifted certain costs and benefits of those laws to

Plaintiffs, providing in relevant part:

> Seller may pass through to Buyer (i) any increase or decrease in such tariff charges or (ii) other increase or decrease in Seller's cost to provide electric power that result from a change in or change in interpretation or administration of current tariffs, laws, regulations or other requirements . . . . Any such addition to or increase in costs shall be Buyer's obligation.

(Power Sale Agreement at 1.)

### III.   Renewable Portfolio Standard ("RPS") Charges

In 2009, during the contract's initial Delivery Period, the Illinois General Assembly passed

Public Act 096-0159.  The Act extended Illinois's Renewable Portfolio Standard ("RPS")—which

requires energy providers to supply a certain percentage of their energy from renewable

---

[4]        *See* E-mail Message from Fahey to Fillar of 6/30/2008, Ex. Q to Pls.' 56.1 ("Integrys has discussed the renewal option Citigo [sic] specified and is amenable to offering Citgo [sic] a 12 month renewal."); E-mail Message from Fahey to Bullinger et al. of 7/3/2006, Ex U to Pls.' 56.1 (internal Integrys e-mail concerning the language Fahey "had sent to Citgo [sic] on Tuesday concerning *their* right to renew for an additional 12 month term." (emphasis added)); E-mail Message from Fahey to Fillar of 7/6/2008, Ex. R to Pls.' 56.1 ("Regarding Citgo's [sic] right to renew for an additional 12 months, the Operating Reserves and the Marginal Loss Credit are the greatest concern."); E-mail Message from Fahey to Pfeifer of 1/8/2009, Ex. V to Pls.' 56.1 (internal e-mail stating "PDV has a renewal right option under their current contract . . . ."); E-mail Message from Fahey to Ringenbach of 5/18/2009, Ex. W to Pls.' 56.1 (internal e-mail stating, "Within the original contract, PDV has an option to renew for an additional 12 month period based on our repricing of 2 ancillary services, TLC and OR."); E-mail Message from Spilky to Mirick of 6/5/2009, Ex. S to Pls.' 56.1 (internal e-mail stating that Plaintiffs "have a one year renewal option . . . which they may or may not exercise in the near future"); E-mail message from Fahey to Zimonick of 6/5/2009, Ex. T to Pls.' 56.1 (internal e-mail stating, "It's time to begin reviewing the fixed Ancillary charges for PDVMR's option to renew for an additional 12 month term.")

sources—to alternative retail electric suppliers ("ARESs"). 220 ILCS 5/16-115D.[5] Integrys is an ARES licensed by the State of Illinois. (Def.'s 56.1 ¶ 32.) In order to comply with the RPS, the Act requires an ARES to make "alternative compliance payments . . . to cover at least one-half of the [ARES's] compliance obligation." 220 ILCS 5/16-115D(b).[6] Should an ARES fails to make the required alternative compliance payments ("RPS charges"), the Act directs the Illinois Commerce Commission ("ICC") to require double the applicable payment and, should there be more than one violation in a five-year period, to revoke the ARES's certificate of service authority. *Id.* § 16-115D(f). The RPS requirements and charges applied to "contracts executed or extended after March 15, 2009." *Id.* § 16-115D(a)(6).

## IV.    Contract Dispute

On June 3, 2009, representatives from both parties participated in a telephone call to address the RPS obligations under the second year option. Participants in the call were Jim Fahey of Integrys; Angela Connor, in-house counsel at Integrys; James Fillar of CITGO; and Christopher Newcomb and Eugene Riccetti, CITGO's in-house attorneys. (Def.'s 56.1 ¶ 41.) A month earlier, on April 30, 2009, Fahey of Integrys had sent an e-mail message to Fillar of CITGO, in which Fahey expressed his tentative belief that the RPS charges would not apply to renewal of the contract for a second year because the Act allows "contracts to be grandfathered if the contract had been signed prior to March 15, 2009," though Fahey noted that he was still researching the issue. (E-mail Message from Fahey to Fillar of 3/30/2009, Ex. FF to Pls.' 56.1.)

---

[5]    An ARES serves as an alternative to the two major retail electric suppliers in Illinois: Ameren Illinois and Commonwealth Edision. Ameren and ComEd were subject to RPS obligations prior to the passage of Public Act 096-0159.

[6]    To fulfill the other half of its compliance obligations, an ARES can make additional alternative compliance payments, generate electricity using renewable energy resources, purchase energy generated by such resources, or purchase "renewable energy credits," an environmental commodity established by state law and generated by renewable energy facilities. *Id.*

In preparation for the telephone conference, Fillar sent Fahey an e-mail message on March 29, 2009, confirming the details of a discussion between Fillar and Fahey at a meeting the previous week, at which they estimated that the annual cost of purchasing enough renewable energy credits to cover CITGO's annual consumption under Integrys's RPS obligations would be $520,000. (E-mail Messages between Jim Fillar to Jim Fahey of 5/29/2009, Ex. 15 to Fillar Dep., Ex. 5 to Def.'s 56.1.) Fahey responded that he was still in discussions with Integrys's legal department about whether the RPS charges would apply. (*Id.*)

By the time of the June 3 telephone call, however, Integrys had concluded that the RPS charges would apply if the parties entered into a second year under the contract, and that Plaintiffs were responsible to pay them according to the Pass Through provision. (Def.'s 56.1 ¶ 44.) CITGO's representatives challenged that conclusion; they took the position that the RPS payments would not apply because they characterized parties' agreement as a two-year contract, with an early termination clause available to Plaintiffs. (*Id.* ¶¶ 45-46.) Angela Connor, Integrys's in-house counsel, recalls that one of CITGO's representatives (she did not remember which one) stated, "What if we just don't pay?" (Connor Dep., Ex. 8 to Def.'s 56.1, at 79, 85.) Connor remembers the tone of the conversation as "pointed," and the tone of the question as "very upset." (*Id.* at 85.) The CITGO representatives suggested that the parties jointly seek clarification from the ICC or submit the disputed contract interpretation to a neutral third party for arbitration or mediation. (*Id.*; Newcomb Dep., Ex. C to Pls.' 56.1 Resp., at 50-51, 55-56.) Although Plaintiffs did not explicitly refuse to pay the RPS charges, Connor further testified that it was her impression from the remarks of CITGO's representatives and their tone that CITGO would not pay the RPS charges under a second year of the contract. (Connor Dep. at 85, 103-05.)

On June 15, 2009, David Pfeifer, Integrys's Managing Director, sent a letter to Fillar of CITGO giving notice that Integrys was terminating the contract at the end of the initial Delivery Period, pursuant to the termination option in subsection (i) of the Confirmation's Renewal provision.

(Def.'s 56.1 ¶ 51.)  In response, Fillar sent a letter on June 16, 2009 stating that CITGO did not accept the purported notice of termination.  (*Id.* ¶ 55.)  According to CITGO's reading of the Renewal provision, Integrys's right to terminate was subject to PDVMR's right to renew.  The letter stated, "Integrys is bound by this two-year contract, which can be abandoned unilaterally by PDVMR in the event PDVMR, at its sole discretion, opts not to enter into a second Confirmation in accordance with the contract after the Initial Delivery Period."  (Letter from Fillar to Pfeifer of 6/16/2009, Ex. 6 to Am. Compl.)

On the day Integrys sent the notice of termination, June 15, Fahey spoke with Fillar by telephone to inform him of Integrys's notice of termination.  Despite hearing from Fahey about the notice, Fillar asked Fahey in that call to provide the rate changes that would apply to the second year.  (Def.'s 56.1 ¶ 57.)  The June 15 notice of termination was presumably already in the mail, but Fahey complied with Fillar's request, leaving a voicemail with information concerning those changes later that evening, and then confirming the message in an e-mail message the next day. (*Id.* ¶ 58.)  On June 24, 2009, PDVMR sent a letter to Integrys giving notice that PDVMR accepted the rate changes and was exercising its option to renew the contract for a second year, pursuant to the Special Conditions of the Confirmation.  (Def.'s ¶ 59.)  In response, Integrys sent a letter rejecting the renewal on the grounds that it had terminated the contract.  (*Id.* ¶ 60.)

Given Integrys's position, Plaintiffs were forced to procure electric power from another supplier after the end of the initial Delivery Period.  CITGO contracted with MidAmerican Energy Company ("MidAmerican") for the provision of electricity at the Lemont Refinery from September 2009 to September 2010.  (*Id.* ¶ 62.)  Under this contract, CITGO paid MidAmerican approximately $295,000 in RPS charges.  (Pls.' 56.1 ¶ 41.)  In addition to these charges, Plaintiffs claim approximately $1.3 million as the difference between what CITGO paid MidAmerican and what Plaintiffs would have paid Integrys under a second year of the contract.  (*Id.* ¶ 40; Def.'s 56.1 ¶ 64.)

**DISCUSSION**

9

I.      **Motion to Strike and Bar Testimony**

As a preliminary matter, the court considers Plaintiffs' motion to strike and bar the testimony of Defendant's expert witness, Kevin K. Wright.  Mr. Wright is President of the Illinois Competitive Energy Association ("ICEA"), a trade association that represents ARESs such as Integrys.  (Wright Report, Ex. A to Wright Decl., Ex. 10 to Def.'s 56.1, at 10.)   He bases his expert report on his involvement in the negotiations that led to the RPS extension under Public Act 096-0159.  (*Id.*) Wright purports to render an expert opinion "with respect to the interpretation, background, and application of Public Act 096-0159 relating to the [RPS] charges."  (*Id.* at 1.)

Plaintiffs object that Wright's expert opinion provides impermissible legal conclusions about the meaning of Public Act 096-0159.  In his expert report, Wright analyzes the statutory language, explains the negotiation process between industry stakeholders and the Office of the Attorney General that resulted in the drafting of Public Act 096-0159, and examines the legislative history to determine the General Assembly's intent in adopting the Act.  In the context of this case, the relevant question concerning Public Act 096-0159 is whether the exercise of a renewal provision in a contract signed prior to March 15, 2009, constitutes a contract "executed *or extended* after March 15, 2009."  220 ILCS 5/16-115D(a)(6) (emphasis added).  This is a question of law for the court to decide, on which the court will instruct the jury.  Given that it is the court that must decide whether the RSP charges would have applied to a second year under the contract's renewal provision, expert testimony on the meaning on Public Act 096-0159 will not aid the trier of fact to "understand the evidence or to determine a fact in issue."  FED. R. EVID. 702.  Even for the court's consideration of this issue, legislative history is not of any consequence where the language of a statute is clear.  *See United States v. Easter*, 553 F.3d 519, 526 (7th Cir. 2009) ("Where, as here, the plain meaning of the statute is unambiguous, that is the end of the matter.");  *United States v. Jones*, 372 F.3d 910, 913 n.2 (7th Cir. 2004) ("[W]here the meaning of a statute is unambiguous,

[a court's] sole task is to apply it straightforwardly to the facts at issue without referring to legislative history or other devices."). The proffered testimony on this purely legal matter is inadmissible.

Plaintiffs also object to Wright's expert testimony on the grounds that Wright expresses an opinion on the application of Public Act 096-0159 to the contract in this case. Specifically, Plaintiffs object to Wright's conclusion that "Integrys correctly applied the RPS charges to its customer's extended or renewed contract in compliance with this new statute." (Wright Report at 3.) Such an expert opinion is an impermissible legal conclusion on an issue that affects the outcome of Defendant's anticipatory repudiation defense. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."); *Scottsdale Ins. Co. v. City of Waukegan*, 689 F. Supp. 2d 1018, 1025 (N.D. Ill. 2010) (citing *Klaczak v. Consol. Med. Trans.*, 458 F. Supp. 2d 622, 636 (N.D. Ill. 2006), for the proposition that an "expert may not testify on the issue of how a contract should be construed under the law"); *Connell v. KLN Steel Products Ltd.*, No. 04 C 194, 2009 WL 691292, at *9 (N.D. Ill. Mar. 16, 2009) ("[A] legal opinion as to the operation of a contract under the relevant laws is not admissible."). "Argument about the meaning of . . . contracts . . . belongs in briefs, not in 'expert reports.'" *RLJCS Enters., Inc. v. Prof'l Benefit Trust Multiple Emp'r Welfare Benefit Plan & Trust*, 487 F.3d 494, 498 (7th Cir. 2007).

Defendant argues that Wright's report is offered for a permissible purpose: "to explain the complex statutory and regulatory scheme created by a series of a clean energy laws, culminating . . . in Public Act 96-0159 . . . and the resulting impact of those laws on Integrys as an alternative retail electric supplier ('ARES')." (Def.'s Resp. in Opp. to Pls.' Mot. to Strike and Bar Testimony of Expert Opinion of Kevin K. Wright, at 1.) Defendant cites a number of cases in which courts have allowed expert testimony concerning the background of complex laws and regulatory schemes, and on how government agencies apply those rules. *See, e.g.*, *United States v. Davis*, 471 F.3d 783, 789 (7th Cir. 2006) ("Experts are permitted to testify regarding how their government agency applies

11

rules as long as the testimony does not incorrectly state the law or opine on certain ultimate legal issues in the case."); *CDX Liquidating Trust ex. rel. CDX Liquidating Tr. v. Venrock Assocs.*, 411 B.R. 571, 588 (N.D. Ill. 2009) (allowing a lawyer expert qualified in "fiduciary duty law" to "provide a helpful explanation to the jury regarding the standard practices and procedures of corporate governance").

The law governing electric utilities in Illinois is indeed complex, but the relevant question in this case is not. The court need only determine whether the RPS charges, applicable to contracts "executed or extended after March 15, 2009," apply to contracts executed before, but containing options to renew exercised after, that date. Further, Wright's testimony does not explain how the ICC has applied the RPS requirements to option contracts since Public Act 096-0159 has gone into effect. Should the court decide that the RPS charges apply to the contract as a matter of law, it will be for the trier of fact to determine whether by words or conduct, Plaintiffs manifested a refusal to pay the RPS charges, in violation of the contract's Pass Through provision, and whether that refusal constituted a repudiatory breach or otherwise justified Integrys's refusal to renew the contract. Expert testimony on the complex regulatory scheme governing electric utilities is not relevant to that question.

Because Wright's testimony constitutes inadmissible conclusions on purely legal matters, the court grants Plaintiffs' motion to strike and bar his testimony. The court will consider the substance of the report only to the extent that it leads the court to otherwise appropriate sources of legislative history, if relevant.

## II.    Cross-Motions for Summary Judgment

The court grants summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV P. 56(a). Where, as here, the parties have filed cross-motions for summary judgment, the court "view[s] all facts and inferences in the light most favorable to the nonmoving party on each motion." *Wis. Alumni*

*Research Found. v. Xenon Pharm., Inc.*, 591 F.3d 876, 882 (7th Cir. 2010). The court may not "assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence." *Stokes v. Bd. of Educ.*, 599 F.3d 617, 619 (7th Cir. 2009).

The court first addresses whether Defendant was entitled to terminate the agreement after the first year and refuse to recognize Plaintiffs' election of their option to renew. Concluding that the contract did not permit the termination under these circumstances, the court then assesses Defendant's anticipatory repudiation and unclean hands defenses.

### A.    Contract Terms

Where a contract's terms are unambiguous, Illinois law applies the "four-corners rule," requiring courts to enforce the contract as written. *See Lewitton v. ITA Software, Inc.*, 585 F.3d 377, 379-80 (7th Cir. 2009); *Cont'l Cas. Co. v. Nw. Nat. Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Enforcing unambiguous contract terms is particularly appropriate when addressing the contracts executed by "commercially sophisticated parties . . . who know how to say what they mean and have an incentive to draft their agreement carefully." *Bank of Am., N.A. v. Moglia*, 330 F.3d 942, 946 (7th Cir. 2003). Where contract terms are indefinite or susceptible to more than one interpretation, however, courts may "look to extrinsic evidence to determine the parties' intent." *Lewitton*, 585 F.3d at 380. When considering such extrinsic evidence, "the factfinder should focus, in descending order of importance, on: (1) the parties' negotiations over the contract at issue; (2) their course of performance; (3) their prior course of dealing; and (4) trade usage in the relevant industry." *Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp.*, 284 F.3d 693, 701 (7th Cir. 2002).

Generally, the interpretation of ambiguous contract terms is a question of fact for the jury. *See Cont'l Cas. Co.*, 427 F.3d at 1041 ("Under Illinois law . . . it is the general rule that 'questions of contractual ambiguity [are given] to the trier of fact, together with the evidence necessary to

resolve them.'" (alterations in original) (quoting *Kinesoft Dev. Corp. v. Softbank Holdings Inc.*, 139 F. Supp. 2d 869, 891 (N.D. Ill. 2001))). Where the extrinsic evidence relevant to the interpretation is undisputed, however, Illinois law places the responsibility for interpreting ambiguous contract terms on the court. *See Patridge v. J.K. Harris & Co., LLC*, 279 F. App'x 406, 409 (7th Cir. 2008); *Cont'l Cas. Co.*, 427 F.3d at 1041. Such interpretation is susceptible to resolution on a motion for summary judgment "if a reasonable jury could not find for [the nonmovant] even when all reasonable inferences are drawn from the undisputed extrinsic evidence." *Cont'l Cas. Co.*, 427 F.3d at 1041.

The court finds the Renewal provision in the Confirmation ambiguous. Phrased in the disjunctive, the contract provides (1) a right to terminate to both parties *or* (2) an option to renew to Plaintiffs—both as alternatives to the default continuation of the contract on a month-to-month term after the initial Delivery Period. The contract does not explain the order of priority between those two alternatives, however. That is, the contract is unclear as to what results when Defendant exercises its right to terminate *and* Plaintiffs exercises their right to renew.

Each party contends that adopting the other side's interpretation vitiates the unambiguous meaning of its preferred alternative. Thus, Defendant insists that the plain terms of the contract prevented Plaintiffs from exercising their right to renew without Defendant's acquiescence. Specifically, Defendant argues that the language in subsection (ii) of the Renewal provision, which requires Plaintiffs' renewal be "evidenced by a fully executed Confirmation for the second year," shows that Plaintiffs did not have a unilateral right to renew. Defendant's argument, however, appears belied by the Special Conditions, also referenced by subsection (ii), which provide for the Confirmation's seemingly automatic renewal should PDVMR exercise its option. ("If PDVMR renews the Confirmation for an additional 12 months . . . the Confirmation *will* renew with the same terms and conditions as the initial Delivery Period." (Confirmation at 4 (emphasis added).).) Additional contract language points to PDVMR as the party capable of exercising the right to renew.

14

("Subject to PDVMR renewing for a second year . . . ." (Confirmation at 3.); "PDVMR shall have the right to renew the Confirmation . . . ." (Confirmation at 4.).) Furthermore, the timing of Plaintiffs' option to renew supports Plaintiffs' argument that Integrys had a unilateral right to terminate only after Plaintiffs chose not to exercise the option: the Special Conditions provide that Plaintiffs' renewal notice was due on June 30, well before the thirty-day notice to terminate.[7]

The Renewal provision is therefore susceptible to two opposing interpretations. Under Defendant's interpretation, Defendant could exercise its right to terminate the contract past the initial Delivery Period, regardless of whether Plaintiff choose to exercise its option to renew.[8] Under Plaintiffs' interpretation, if Plaintiffs did not exercise their right to renewal, *only then* could either party terminate the contract and prevent renewal on a month-to-month basis.

---

[7]     For these same reasons, the court does not read the Renewal provision's reference to a "fully executed Confirmation" to require a second, mutual writing as a condition precedent to a binding renewal for the second year. Courts applying Illinois law consider the following factors "'persuasive' in determining whether the execution of a written contract was intended as a condition precedent: (1) whether this is the type of business arrangement that is reduced to writing; (2) whether the amount of money is substantial; (3) whether significant provisions were not previously discussed or agreed upon; and (4) whether the parties' negotiations show that a writing was anticipated." *David Copperfield's Disappearing, Inc. v. Haddon Adver. Agency, Inc.*, 897 F.2d 288, 292 (7th Cir. 1990). The court considers factor (3) the most relevant in this case. The parties had already negotiated all the terms material to the second year in the first Confirmation, and agreed that the Confirmation would renew if Plaintiffs exercised their option.

[8]     Defendant does not go so far as to argue that the renewal provision was an unenforceable "agreement to agree," but that appears to be the natural consequence of its interpretation. There is no meeting of the minds where the parties have reached "a tentative agreement contingent upon the successful completion of negotiations that are ongoing." *Ocean Atl. Dev. Corp. v. Aurora Christian Schs., Inc.*, 322 F.3d 983, 996 (7th Cir. 2003) (applying Illinois law). A contract that calls for the parties to reach another agreement in the future is enforceable, however, if "'the terms to be agreed upon in the future can be determined independent of a party's mere 'wish, will, and desire' . . . , either by virtue of the agreement itself or by commercial practice or other usage or custom.'" *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 565 (7th Cir. 2012) (alteration in original) (quoting *United States v. Orr Constr. Co.*, 560 F.2d 765, 769 (7th Cir. 1977)) (internal quotation marks omitted) (applying Illinois law). In this case, the Special Conditions provided for the exact terms of the Confirmation for the second year, and the only changes from the first-year Confirmation resulted from application of an algorithm to account for changes in certain fees. As far as those terms were concerned, the contract is enforceable even if it did call for the parties to reach another agreement in the future.

Plaintiffs present compelling extrinsic evidence in favor of their interpretation. Plaintiffs' original RFP contemplated that CITGO would have the option to renew after twelve months (CITGO RFP, Ex. A to Pls.' 56.1), a fact that Fahey acknowledged in an e-mail message to fellow Integrys employees while preparing the draft Confirmation. (E-mail Message from Fahey to Bollinger et al. of 6/30/2008, Ex. P to Pls.' 56.1.) The circumstances surrounding Integrys's pricing error in its initial response to the RFP also supports Plaintiffs' interpretation: Integrys offered to take the full loss of the pricing error for a single year contract, or split the cost of the error over a one-year contract with an option for Plaintiff to renew for an additional year. The second option does not offer Plaintiffs a clear advantage over the first if the right to renew is subject to Integrys's right to terminate the contract after the first year. Other statements made by Integrys representatives, both during negotiations and during the course of performance, reflect their understanding that Plaintiffs had a unilateral right to renew the contract for a second year. *See supra* note 3.[9]

By comparison, the only extrinsic evidence Defendant marshals in support of its interpretation is that the termination provision of subsection (i) of the Renewal provision remained unchanged from the very first draft of the contract, and was a standard term in Integrys's contracts. Weighed against the extrinsic evidence of the negotiation process presented by Plaintiffs, Defendant presents little convincing evidence in support of its interpretation, especially in light of other language in the contract that runs counter to Defendant's position that the contract provided only a bilateral option to renew. Because none of the extrinsic evidence is controverted, contract interpretation is a question of law for the court. Even drawing all reasonable inferences in favor of Defendant, the court concludes no reasonable jury could conclude that Defendant had a unilateral right to terminate the contract that trumped Plaintiffs' option to renew. Consequently, Defendant

---

[9] Other communications Plaintiffs cite speak of an "option to renew," but do not specify which party may exercise it. No communications during contract negotiation suggest that CITGO representatives understood Plaintiff's option to renew to be subject to Defendant's right to terminate.

breached the contract by terminating it past the initial Delivery Period and refusing to proceed with the deal after Plaintiffs had exercised their right to renew.

### B.    Affirmative Defenses

Defendant raises a number of affirmative defenses to Plaintiffs' breach of contract claim. The parties have filed cross-motions for summary judgment on Defendant's claim that Plaintiffs anticipatorily breached the contract when Plaintiffs' representatives contested the obligation to pay RPS charges under a second year of the contract. Defendant claims Plaintiffs' position was in violation of the contract's Pass Through provision, which allowed Defendant to pass the cost of any change in law to Plaintiffs. Plaintiffs also seek summary judgment on Defendant's unclean hands defense, which rests on Defendant's contention that Plaintiffs' position with regards to the RPS charges was taken in bad faith. The court considers, first, whether the RPS charges required by Public Act 096-0159 would have applied to the second year of the contract as a matter of law.

### 1.    Applicability of the RPS Charges

Defendant's affirmative defenses depend, in part, on whether Plaintiffs are correct in insisting that the RPS charges would not have applied to the second twelve-month term. The Act requires such payments on contracts "executed or extended after March 15, 2009." 220 ILCS 5/16-115D(a)(6). Neither party provides any case law or ICC regulations or administrative decisions applying the RPS effective date to option contracts signed before that date.

During the June 3 conference call and in their June 16 letter rejecting Integrys's termination notice, Plaintiffs asserted that the contract was for a two-year term, subject to Plaintiffs' unilateral right to terminate. The plain terms of the contract refute that position. The contract provided for an initial twelve-month Delivery Period, and gave Plaintiffs an option to *renew* for an additional twelve months. Renewal for the second year was not automatic; rather, continuation of the contract's terms on a month-to-month basis was the default should neither side act by the end of

the initial Delivery Period. To exercise the option to renew, Plaintiff had to give notice of its decision after accepting certain rate changes.

Before this court, Plaintiffs now argue that the RPS charges are inapplicable because the parties signed an option contract prior to March 15, 2009. Essentially, Plaintiffs claim that their decision to exercise the option relates back to the earlier date on which the parties executed the contract. Confronting the statutory language, Plaintiffs argue that electing an option to *renew* a contract is not the same as a contract *extended* after the applicable date. In the court's view, any distinction between these concepts is, in this context, a distinction without a difference. Plaintiffs appear to believe that the term "extended" should be limited to contract extensions that are not contemplated in the original contract's terms.[10] But any extension for which a contract's terms do not provide would require a newly executed contract, subject to all the prerequisites of contract formation. Consequently, such an extension would fall within the meaning of contracts "executed . . . after March 15, 2009." If the statutory distinction between contracts "executed *or* extended" is to have any meaning, "extended" must incorporate contracts that provide for their own extension, as this one does.[11] The court concludes that the RPS charges would have applied to a second year as an extension of the contract occurring after March 15, 2009.

Given this conclusion, the court grants Defendant partial summary judgment on the issue of damages. The Power Sale Agreement of the contract contained a remedy provision, which provided that in the event of Integrys's (the "Seller's") default, "and the price for replacement electric power . . . is higher than the amount the Buyer would have paid under this Agreement (including

---

[10]     Notably, Plaintiffs' proposed distinction contradicts the distinction made between contract renewal and contract extension found in *Black's Law Dictionary*, which defines "renewal" in the Contracts context to mean, "The re-creation of a legal relationship or the replacement of an old contract with a new contract, as opposed to the mere extension of a previous relationship or contract." *Black's Law Dictionary* 1322 (8th ed. 2004).

[11]     Nothing in the legislative history referenced by Defendant's expert witnesses suggests that the General Assembly used the term "extended" in a particular or unusual manner.

energy, capacity, and other components), then Seller shall pay Buyer Early Termination Damages in the amount of such positive difference . . . ."  (Power Sale Agreement at 2.)  Because the court concludes that Plaintiffs would have been obligated to pay RPS charges under the contract, they cannot claim the $275,073 in RPS charges they paid to MidAmerican as a component of their damages.

### 2.    Anticipatory Repudiation

Under Illinois law, an affirmative defense of anticipatory repudiation is a question of fact. *See Arlington LF, LLC v. Arlington Hospitality, Inc.*, 637 F.3d 706, 713 (7th Cir. 2011) (citing *Timmerman v. Grain Exch., LLC*, 394 Ill. App. 3d 189, 201, 915 N.E.2d 113, 124 (5th Dist. 2009); *Truman L. Flatt & Sons Co. v. Schupf*, 271 Ill. App. 3d 983, 987, 649 N.E.2d 990, 994 (4th Dist. 1995)).  Defendant must show that Plaintiffs manifested "a clear, unequivocal intent not to perform under the contract when performance is due." *Id.* (citing *In re Marriage of Olsen*, 124 Ill. 2d 19, 24, 528 N.E.2d 684, 686 (1988); *Draper v. Frontier Ins. Co.*, 265 Ill. App. 3d 739, 745, 638 N.E.2d 1176, 1181 (2d Dist. 1994)).  The repudiation must constitute a material breach of contract.  *See id.* ("The repudiation has to 'render unattainable' the point of the contract.").

A party may repudiate by words or other conduct, and "although a party may state that it intends to honor its obligations, it may still repudiate the contract by insisting that it is obligated to perform only according to its own incorrect interpretation of the contract's terms." *Kinesoft Dev. Corp.*, 139 F. Supp. 2d at 897 (citing *Olsen*, 124 Ill. 2d at 24, 528 N.E.2d at 686; E. Allen Farnsworth, *Farnsworth on Contracts* § 8.21, at 536-37 (2d ed. 1998)); *see also Busse v. Paul Revere Life Ins. Co.*, 341 Ill. App. 3d 589, 594, 793 N.E.2d 779, 783 (1st Dist. 2003) (quoting *Kinesoft*'s analysis without citation).  *But see Feliberty v. Unumprovident Corp.*, No. 03 C 7569, 2003 WL 22991859, at *2 (N.D. Ill. Dec. 16, 2003) ("[T]here is no anticipatory repudiation when a party makes statements that it will perform in accordance with its interpretation of the contract unless that interpretation is manifestly incorrect or unreasonable.").  "When one party has

committed a repudiation, the other party can treat the contract as ended." *Arlington LF*, 637 F.3d at 713.

Defendant contends that Plaintiffs clearly and unequivocally expressed their position that the RPS charges would not apply to a second year should Plaintiffs exercise their right to renew. Defendant points to the disagreement at the June 3, 2009 conference call, in which Plaintiffs maintained that the contract was a two year contract (and therefore exempt from RPS charges), a view that Plaintiffs again asserted in the July 16, 2009 letter in response to Defendant's notice of termination. Defendants also note Connor's testimony that on the June 3 call, one of Plaintiffs' representatives asked, "What if we just don't pay?" Connor also described the tone of the conversation as "pointed," and the tone of the individual's question as "very upset." Defendant claims that Plaintiffs' misinterpretation of the contract and the RPS charges was a repudiation of Plaintiffs' obligations to pay those charges according to the contract's Pass Through provision.

At this stage, Plaintiffs do not contest that if the RPS charges applied to the second year of the charges, Plaintiffs would have had an obligation under the contract to pay those charges. Plaintiffs deny that their representatives clearly and unequivocally manifested Plaintiffs' intent not to pay the charges, however. They point out that none of their representatives expressly stated that Plaintiffs would not pay the RPS charges. At most, Plaintiffs claim, one of their representatives may have asked a hypothetical question about what would result if Plaintiffs did not pay. As Plaintiffs characterize their discussions on this issue, they never took a "hardened inflexible position" on the RPS charges, and were engaged in an amicable discussion with Defendant until the notice of termination. (Pls.' Resp. to Def.'s Mot. for Summ. J. at 9 (quoting *Commonwealth Edison Co. v. Decker Coal Co.*, No. 84 C 9573, 1986 WL 1010, at *2 (N.D. Ill. Jan. 8, 1986)).) Indeed, one of the options discussed on the June 3 call, according to Plaintiffs, was for CITGO to pay the RPS charges into an escrow account and seek clarification from the ICC or a neutral third party as to whether the charges actually applied—an approach Plaintiffs contend the Defendant has taken in

20

other cases where there is disagreement about the application of the Illinois Public Utilities Act to its contractual arrangements. (Pls.' Additional Facts to Controvert Integrys' Claim for Summ. J. ¶¶ 4-5.) Plaintiffs also note that Defendant could have, but did not, ask Plaintiffs for an assurance of performance.

Although the facts underlying the anticipatory repudiation claim are not in dispute, reasonable jurists could disagree about the inferences to draw from these facts. Whether the words and conduct of Plaintiffs' representatives were enough to constitute a "clear and unequivocal" repudiation of Plaintiffs' obligation to pay the RPS charges is a close question on these facts. Consequently, summary judgment is not appropriate for the anticipatory repudiation defense.

### 3.    Unclean Hands

Summary judgment is appropriate on Defendant's unclean hands defense, however. Under Illinois law, unclean hands is a defense to a claim seeking equitable relief, not a defense to an action for contract damages. *See Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 822 (7th Cir. 2010) ("A plaintiff who acts unfairly, deceitfully, or in bad faith may not *through equity* seek to gain from that transgression." (emphasis added)). Indeed, the Illinois appellate court case cited in both parties' briefs addressed whether a party's alleged misconduct precluded the circuit court from granting a motion for preliminary injunction. *See Reg'l Transp. Auth. v. Burlington N. Inc.*, 100 Ill. App. 3d 779, 786, 426 N.E.2d 1143, 1148 (1st Dist. 1981) ("We do not believe any breach of contract on the part of RTA would constitute unclean hands, so as to preclude its right to seek *equitable relief*." (emphasis added)).

In this case, Plaintiffs seek damages for breach of contract, not equitable relief. In similar circumstances, courts within this district, applying Illinois law, have declined to recognize the affirmative defense of unclean hands. *E.g.*, *RBS Citizens, N.A. v. Sanyou Import, Inc.*, No. 11 C 1820, 2011 WL 2712744, at *4 (N.D. Ill. July 13, 2011) (Kocoras, J.); *HSBC Mortg. Servs., Inc. v. Equisouth Mortg., Inc.*, No. 10 C 4747, 2011 WL 529412, at *3 (N.D. Ill. Feb. 7, 2011)

21

(Leinenweber, J.); *Gen. Elec. Bus. Fin. Servs., Inc. v. Silverman*, 693 F. Supp. 2d 796, 804 (N.D. Ill. 2010) (Gettleman, J.); *Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, No. 07-CV-1394, 2009 WL 1329217, at *5 (N.D. Ill. May 13, 2009) (Aspen, J.); *accord Zahl v. Krupa*, 365 Ill. App. 3d 653, 658, 850 N.E.2d 304, 310 (2d Dist. 2006); *Am. Nat'l Bank & Trust Co. of Chicago v. Levy*, 83 Ill. App. 3d 933, 936, 404 N.E.2d 946, 948-49 (1st Dist. 1980).  Consequently, the court grants Plaintiffs' motion for summary judgment as to Defendant's unclean hands defense.

## CONCLUSION

For the reasons stated above, the court grants Plaintiffs' motion to strike and bar testimony of Defendant's expert witness [49].  The parties' motions for summary judgment are granted in part and denied in part.  The court concludes that Defendant was not entitled to terminate the parties' agreement.  Plaintiffs' motion for summary judgment [52] is granted with respect to Defendant's unclean hands defense and denied with respect to the defense of anticipatory repudiation.  Defendant's motion for summary judgment [46] is granted with respect to the exclusion of RPS charges as a component of damages, but denied in all other respects.  The parties are encouraged to attempt to settle this dispute.

ENTER:

Dated:  June 1, 2012

_____
REBECCA R. PALLMEYER
United States District Judge

22